## Collins v. Commonwealth.

Feb. 8, 1944.

Cleon K. Calvert for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK— Affirming.

Shiloh Collins and John Donaldson were indicted jointly for the murder of Evie Miller. On a separate

trial Collins was found guilty and his punishment fixed at life imprisonment. He is asking reversal of the judgment on the grounds that (1) no fact elicited from one accused of crime, while in custody, by an officer in answer to questions put to him by the officer, is admissible against him on a trial; and (2) the evidence does not support the verdict and the judgment thereon.

Miller was killed at his home around 8:30 p. m. on September 5, 1942. During the afternoon of that day he, a cousin, Fred Miller, John Donaldson, and Jim Carroll were playing poker near a store on Straight Creek. Donaldson and Miller got into an argument and Donaldson struck Miller with his crutch. The game broke up about 4 o'clock and Fred Miller and his wife went home with Evie. His wife said he arrived there about 7 p. m., ate his supper and went to bed about 7:30. The other parties went to bed about the same time. Sometime between 8 and 8:30 the Millers heard some one "hollering," singing and shooting pistols about 100 yards down the railroad track from their home. John Donaldson's voice was recognized, but no other voice was identified. Some shots were fired into the Miller home at which time the Millers got up and went out back of the house. Evie went back inside, got his flashlight and went to the front door and opened it. He called out, "Hi, Lonnie, is that you?" A voice answered, "Yes, it is me, Evie." Miller then flashed his light toward the railroad track and the shooting began again. He was killed instantly by a bullet in his head. Both .45 and .38 caliber bullet holes were found about the Miller house, and empty shells of both caliber were found outside. The evidence does not show clearly how many persons were with Donaldson. Some of the testimony would indicate there was only one other person, while Fred Miller said there were three or four in the party.

Since there was no hard feeling shown between Evie Miller and Shiloh Collins, and since no witness definitely placed him with Donaldson at the time of the shooting, it is necessary that we review carefully the evidence tending to connect him with the crime. We admit frankly the case is a close one.

At about 7 p. m. of the day of the shooting, Collins and Donaldson arrived at the home of Jim Carroll, who lived a little more than a quarter of a mile from the

home of Evie Miller. Carroll said Donaldson asked him if he knew anything about Evie Miller and he said he did not, and he had not seen him since the poker game broke up. The only statement attributed to Shiloh was after Donaldson asked Carroll if he would lie about it, Shiloh said, "No, I don't believe Jim Carroll would tell me a lie about it." He said also that John Donaldson had a pearl-handled pistol in his pocket. Collins and Donaldson next appeared at the home of Buck Lock, who lived about 100 yards down the railroad track from Evie Miller. Lock said they came to his house shortly before the shooting took place up at Miller's; that they had some liquor with them; and that all of them drank some. He said both parties had pistols, and that Donaldson's was pearl-handled, while Shiloh's was a blue looking gun. He said he heard some shots fired about 15 or 20 minutes after Donaldson and Collins left his home. He did not know whether they went up or down the railroad track after leaving. He said he heard Mrs. Miller calling after the shots were fired. He then took his children to the home of a nearby neighbor, Harris, and when asked whether he heard any one coming down the railroad track, he said he did not. Verna Lock, the eleven year old daughter of Buck Lock, said she saw Donaldson and Collins at her home before the shooting and that after she reached the Harris home she heard some one coming down the railroad track and the voice sounded like that of Shiloh Collins. On cross-examination she said: "Q. You didn't tell me when I first talked to you about recognizing his voice, or did you? A. No, sir, the first time I recollected was when the Commonwealth's Attorney showed it to me on the paper.

"Q. When did he show it to you on paper? A. Last Monday."

Shiloh and Donaldson were arrested about midnight. Donaldson was found at the home of his father and Shiloh was found at his home alone. He was lying on a bed, face down, with his clothes on, according to the testimony of a deputy sheriff. This officer said both parties were drunk. Donaldson's father brought two pistols, a .45 and a .38, to the sheriff's office about a week after the killing. He said he found them in a sack in a spring about 200 or 300 yards from Collins' home. He said the point was about the same distance from his home.

Out of the presence of the jury the sheriff testified that he talked with Collins the morning after he was placed in jail. His testimony follows:

"Q. Before you talked to him and before he said anything to you, did you make him any promise or offer him anything at all in the way of immunity before he told you what he did tell you? A. No, sir, I didn't.

"Q. Did he or not voluntarily and of his own free will and accord make this statement to you about which I desire to ask you? A. I asked him if he had any objection to telling me where those pistols were. He said he did not and he said as soon as his wife came down he would tell his wife where they were and she could get them or some one go with him.

"Q. Was that voluntarily made? A. Yes, sir." Over the objection of counsel for Collins the trial judge permitted the sheriff's evidence to go to the jury.

Collins testified he and Donaldson and Barnes got together sometime between 6 and 7 o'clock of the evening Miller was killed; they started out looking for some whiskey; he and Donaldson went to Jim Carroll's home, but Barnes stayed out on the railroad track; Barnes had a .38 special pistol; he took the gun from Barnes because he was about half drunk and he was· afraid he would shoot somebody; after they left Carroll's home they went to the home of Buck Lock; only he and Donaldson went in because Barnes said he did not want to go into the home of strangers; when they came out of the Lock home, Barnes asked for his pistol and he gave it to him; Barnes and Donaldson wanted to go on up the road to get some whisky; he went down the railroad track, met two of his brothers, and as they were starting homeward he heard some shooting up the track; he did not know who fired the shots and he did not go to the home of Evie Miller; he did not own a pistol; when he talked with the sheriff he was told, "If you will turn in that gun, if you know anything about them, it will make it lighter;" he told the sheriff he knew nothing about the guns and that he did not own one; he had never spoken to the Lock girl more than two or three times and he did not pass the Harris home after the shooting; Barnes was arrested the same night as he and Donaldson, but he did not know where he was at the time of the trial; he had never had any trouble ·

with Miller; Donaldson had some whisky when they went into the Carroll home; he did not make the statement attributed to him by Jim Carroll; and Barnes was drunk and he and Donaldson were about half drunk.

Mrs. Collins testified Shiloh did not own a pistol; he left home around 7 p. m. with Barnes and Donaldson; she went to the home of his mother and spent the night; and Shiloh came by there about 9 or 9:30 and went on home. Collins' two brothers testified they were on the lookout for him; met him coming down the railroad track; and as they were all going home they heard some shots up the track.

Counsel for Collins vigorously contends the sheriff's testimony runs afoul of the anti-sweating statute, KRS 422.110. The first part of this section follows: "(1) No peace officer, or other person having lawful custody of any person charged with crime, shall attempt to obtain information from the accused concerning his connection with or knowledge of crime by plying him with questions, or extort information to be used against him on his trial by threats or other wrongful means, nor shall the person having custody of the accused permit any other person to do so. * * *" The sheriff and Collins were in a room alone when they had their conversation. It is clear from the testimony of both Collins and the sheriff that no threats were made, nor was the accused plied with questions. Only a few questions were asked and they concerned the whereabouts of the guns. The sheriff said Collins made his statements voluntarily. Collins denied he made any such answers, though he did say he was told it would be lighter on him if he told about the guns. We believe it would be going far afield to hold the anti-sweating statute applicable to a case such as the one here involved. To do so would make it virtually impossible for an officer to talk with an accused person in custody to any extent.

It is insisted no testimony other than that of the sheriff in any way connected Collins with the killing, and that his testimony was very damaging. We are not inclined to consider it of such weight. It did have the effect of leaving the impression that Collins knew where the guns were, but he expressly denied he knew their whereabouts. It must not be overlooked that only the testimony of Collins brings Barnes into the picture other than at the time he was said to have gone to the Collins

home with Donaldson around 7 p. m. The jury did not have to accept his rather dubious explanation of how he came into possession of a pistol. Collins knew of the difficulty which the deceased and Donaldson had in the poker game, and he admitted he and Donaldson were drinking. His own testimony placed him very near the scene of the shooting a few minutes before it took place, and it was only his testimony and that of his two brothers which placed him down the railroad track at that time. It is our conclusion, after a careful study of the record, that there was sufficient evidence to warrant the submission of the case to the jury. The credibility of the witnesses was for them to determine. Burks v. Commonwealth, 294 Ky. 183, 171 S. W. (2d) 231. Were we to hold otherwise, we would be saying in effect there was not more than a scintilla of evidence connecting Collins with the murder of Miller, and this we are not disposed to do.

Judgment affirmed.